WESTINGHOUSE AIR BRAKE CO. v. NEW YORK AIR BRAKE CO.

(Circuit Court, N. D. New York. December 20, 1901.)

No. 6,632.

PATENTS—INFRINGEMENT—ENGINEER'S VALVE FOR CONTROLLING AIR BRAKES.

The Westinghouse & Moore patent, No. 401,916, for an improved engineer's brake-valve, designed to secure an equalization of pressure throughout the longest train pipe, so that the brakes on all the cars are released at substantially the same time where the train has been slowed down, or has made a service stop, and which is accomplished by a piston which closes the discharge valve automatically and slowly, was not anticipated, and is valid, and the device shown was the first reliable and efficient one for the purpose, and is of a high degree of merit. The patent construed, and *held* infringed by a valve made in accordance with the Vaughan and McKee patent, No. 504,290.

In Equity. Suit for infringement of patent. On final hearing.

Frederic H. Betts, George H. Christy, J. Snowden Bell, and F. G. Fincke, for complainant.

Frederick P. Fish, Charles Neave, and J. T. A. Doolittle, for defendant.

COXE, District Judge. This is an equity suit for the infringement of letters patent No. 401,916, granted to George Westinghouse and Frank Moore April 23, 1889, for an improved engineer's brake-valve. By means of this mechanism, which is located in the cab of the locomotive, the engineer is able to exercise the necessary control over the brakes of the entire train, whether long or short. The specification contains the following general statement:

"Our invention relates to appliances employed in automatic brake mechanisms for effecting and regulating the supply of air under pressure from a main reservoir or source of supply to a brake or train pipe in the release of the brakes, and its exhaust from the brake-pipe into the atmosphere in the application of the brakes. The object of our invention is, primarily, to provide for such gradual opening and closure of the valve which controls the discharge of air from the brake-pipe as to cause a substantial equalization of pressure in the brake-pipe and uniform application of the brakes throughout the length of the train, and obviate the liability to release the

brakes on the forward cars in long trains, which has heretofore been found to be induced by an inequality of pressure in the brake-pipe occasioned by the quick release of a considerable quantity of air and the sudden closure of the discharge-valve thereafter, and from which the breaking of the train into two or more sections has sometimes resulted. A further object of our invention is to effect a simplification of structure and prevent the access to the valve-operating piston of grease or other foreign matter tending to clog or interfere with its free and normal movements."

The claims alleged to be infringed are the third, fourth, sixth, seventh, eighth and ninth. They are as follows:

"(3) In an engineer's brake-valve, the combination of a movable abutment fitted to work in a chamber communicating with a brake-pipe connection on one side of the abutment, a discharge-valve connected to said abutment and controlling a pipe leading from the brake-pipe connection to the atmosphere, a supply-port for establishing equilibrium of brake-pipe pressure in the chamber on opposite sides of the abutment, an exhaust-port for relieving pressure in the chamber on the side of the abutment opposite that which is in communication with the brake-pipe connection, and a regulating-valve controlling said supply and exhaust ports, substantially as set forth.

"(4) In an engineer's brake-valve, the combination of a valve casing or chamber, a main air-reservoir connection and a brake-pipe connection leading thereinto, a direct supply-port formed in a valve-seat in the chamber and adapted to establish direct communication between said connections, a movable abutment fitted to work in a chamber in the casing communicating on one side of the abutment with the brake-pipe connection, a discharge-valve connected to said abutment and controlling a passage from the brake-pipe connection to the atmosphere, an equalizing supply-port leading from the abutment-chamber to the valve-seat on the side of the abutment opposite to that which is open to the brake-pipe connection, and a regulating-valve working on the valve-seat and controlling the direct supply and equalizing ports, substantially as set forth."

"(6) In an engineer's brake-valve, the combination of a valve casing or chamber, a main air-reservoir connection and a brake-pipe connection leading thereinto, a direct supply-port formed in a valve-seat in the chamber and adapted to establish direct communication between said connections, a movable abutment fitted to work in a chamber communicating on one side of the abutment with the brake-pipe connection, a discharge-valve connected to said abutment and controlling a passage from the brake-pipe connection to the atmosphere, an equalizing supply-port leading from the abutment-chamber to the valve-seat on the side of the abutment opposite to that which is open to the brake-pipe connection, an exhaust-port leading from the valve-seat to the atmosphere, and a regulating-valve working on the valve-seat and controlling the several port-openings therein, substantially as set forth.

"(7) In an engineer's brake-valve, the combination of a valve casing or chamber, a main air-reservoir connection and a brake-pipe connection leading thereinto, a direct supply-port formed in a valve-seat in the chamber and adapted to establish direct communication between said connections, a direct exhaust-passage leading from the valve-seat to the atmosphere, and a regulating-valve working on the valve-seat and controlling the direct supply-passage and having a recess or cavity adapted to establish communication between the brake-pipe connection and the direct exhaust-passage, substantially as set forth.

"(8) In an engineer's brake-valve, the combination of a valve casing or chamber, a main air-reservoir connection and a brake-pipe connection leading thereinto, a direct supply-port formed in a valve-seat in the chamber and adapted to establish direct communication between said connections, a direct exhaust-passage leading from the valve-seat to the atmosphere, a discharge-valve controlling an independent exhaust-passage from the brake-pipe connection, a movable abutment connected to the discharge-valve, and a regulating-valve controlling ports by which, respectively, an equilibrium of pressure is established and a difference of pressure is effected on opposite sides of the abutment, and also controlling communication between the direct

supply-port and the brake-pipe connection and between the brake connection and the direct exhaust-passage. substantially as set forth.

"(9) In an engineer's brake-valve, the combination of a movable abutment fitted to work in a chamber communicating with a brake-pipe connection on one side of the abutment, a supplemental reservoir communicating with said chamber on the other side of the abutment, a discharge-valve connected to said abutment and controlling a pipe leading from the brake-pipe connection to the atmosphere, a supply-port for establishing equilibrium of brake-pipe pressure in the chamber on opposite sides of the abutment, an exhaust-port for relieving pressure in the chamber on the side of the abutment opposite that which is in communication with the brake-pipe connection, and a regulating-valve controlling said supply and exhaust ports, substantially as set forth."

At the argument it was stated by complainant's counsel that in their judgment the fourth and eighth claims contain the best exposition of the invention. The defendant's valve is made under letters patent No. 504,290, granted to Vaughan & McKee, August 29, 1893. The only defense argued is that of noninfringement. Mr. Westinghouse was a pioneer in this art. The first air brake was invented by him in 1868. This was known as the "straight air brake" and although it was a most meritorious invention the defects and limitations were early demonstrated. Improvements soon followed, and in 1872 Mr. Westinghouse invented the "automatic air brake" which was followed in 1886–87 by the "quick action automatic air brake." By these inventions an exceedingly efficient system of quick acting power brakes was produced. As these earlier patents have been the subject of protracted litigation between these parties and as the inventions covered thereby have been carefully described and analyzed in previous decisions it is not necessary to review the prior art in detail or repeat what the courts have said regarding it. 59 Fed. 581; 11 C. C. A. 528, 63 Fed. 962; 65 Fed. 99; 69 Fed. 715; 77 Fed. 616. A perusal of these decisions will demonstrate the extent of Mr. Westinghouse's contributions to the art. He was constantly engaged in an effort to correct existing defects, and, as new difficulties arose, he set himself to the task of overcoming them with a persistency that never faltered. The present system is the evolution of a quarter of a century of patient and restless endeavor.

The patent in suit relates to an improvement designed to remedy certain defects which were developed when a long train was being stopped at stations or slowed down without being brought to a standstill. Prior to the invention in question the engineer in making a service stop or in slowing down opened his brake-valve a little, permitting the escape of a small quantity of air, and then slowly closed the valve. The closing, being regulated by hand, was not uniform and sudden action was frequently followed by serious consequences resulting in damage, inconvenience and delay, and a possible loss of life and limb. The reason that the handclosed valve was imperfect and dangerous may be briefly stated. In order to set the brakes a reduction of pressure in the train pipe is necessary. The air is released by the valve on the locomotive and the brakes at the forward end of the train are the first to feel the effect of the opening of the valve. In the meantime the compressed air in the rear portions of the train pipe, which on freight trains is often over a third of a mile in length,

is moving towards the vent with increasing momentum. If the vent be suddenly closed the air is piled up, so to speak, at the forward end of the pipe thus exerting sufficient pressure to release the brakes on the cars at the front end of the train. The forward surging of the air operates to set the rear brakes and release the front brakes thus causing the train to be pulled apart. The defect was a serious one; every one recognized it and its cause, but for a long period no one found a satisfactory cure. What was needed was an engineer's valve which would secure a uniform reduction of pressure throughout the longest train pipe, so that the brakes, on all the cars alike, would be released at the same time. After several years of experiment such a valve was secured by the efforts of Westinghouse and Moore. They succeeded in producing a slow closing of the vent port, which closing is accomplished automatically beyond the volition and control of the engineer. His work is done when he opens and closes the cock which reduces the pressure in the chamber above a piston connected by a stem to the vent valve, which is raised from its seat by the unreduced pressure below the piston. The opening of the vent port gradually reduces the pressure below the piston until it is less than the pressure above and thus the valve will close, slowly at first, but more and more slowly as the pressure above and below is equalized, until the final resting of the valve on its seat is almost imperceptible. All this is accomplished by the patented device which, though scarcely larger than an ordinary teapot, is a complicated labyrinth of valves, ports, chambers and passages which it is difficult to describe except diagrammatically. It is enough to say for present purposes that it accomplished the desired result. In the language of the specification:

"The slow and gradual downward movement of the piston in closing the discharge-valve admits of a sufficient time for the equalization of pressure throughout the entire length of the brake-pipe and thereby insures a substantially uniform application of the brakes on all the cars of a long train."

In short, the patented valve is an almost perfect train controller.

That the complainant's valve involves invention is, of course, conceded and that it was invention of a high order cannot be successfully disputed. It was the first engineer's valve which gave him complete control of a very long train under all ordinary conditions. It was the first valve, having these characteristics, which was commercially successful. There is nothing in the prior art which materially affects the invention except what was done by Mr. Westinghouse himself.

It is argued by the defendant that in view of the prior Westinghouse structures the claims of the patent in suit must be limited so that they do not include the defendant's device. It must be admitted that this proposition is one that does not commend itself strongly to a court of equity. The court should not, it would seem, be overzealous in searching in the complainant's own arsenal for a weapon with which to give the coup de grace to the patent. If the inventor has previously given his invention to the public there should be no hesitation in saying so, but care should be taken not to confound the perfected and operative structure with prior experiments

and ineffectual attempts to reach results. The thing that succeeds should not be destroyed by the thing that failed. To restrict the claims within such narrow limits that every ingenious mechanic can infringe with impunity is to destroy the patent. The new result accomplished by the invention was the absolute control by the engineer of a long train of cars while "graduating" or making "service" stops. This was done by the automatic slow closing of the vent-valve, the following being the principal elements of the invention: First. A direct supply-port between the main reservoir and the train-pipe. Second. A piston for operating the vent valve. Third. A supply port for equalizing the pressure on opposite sides of the piston. Fourth. A regulating valve controlling the direct supply from reservoir to train pipe and the pressure of the abutment chamber. The essence of the invention, therefore, is the combination of the foregoing elements to produce the result as stated. In order to defeat or seriously limit the patent a similar combination producing a like result must be found in the prior art. A combination similar in some particulars, but which failed to accomplish the result in question, and by that is meant the automatic slow closing of the valve, will be insufficient to destroy the patent. Unquestionably the best references introduced by the defendant are the two engineer's valves known as "B 12" and "C 7." These were both constructed under the supervision of Mr. Westinghouse and were tentatively introduced by the complainant. About 100 of the B 12 valves were made in 1885, 1886 and 1887, and 2,116 of the C 7 valves were made in 1887 and 1888. Seventy-five of the former and all of the latter were put into actual use on locomotives. The complainant insists that neither of these can be considered for the reason that they were merely experimental steps which, in January, 1889, finally culminated in the completed invention. Assuming that they belong legitimately to the prior art it will only be necessary to examine the C 7 valve as the two are admitted to be essentially similar and the C 7 is not only simpler in construction but was the successor of B 12 in the art. No long description of the C 7 valve or minute comparison with the patented valve is necessary to show its similarity in appearance and general method of operation. This is obvious and the reason is also obvious, for they were made by the same person. The operative parts were retained by him and his attention was devoted to improvements in the inoperative parts.

The crucial question will be reached more quickly if the examination be confined to the differences rather than the similarities, for it is upon these differences that the invention rests. Let it be assumed, then, that the two devices are substantially alike except in the mechanism designed to produce uniform reduction in a long train-pipe, viz.: the discharge-valve and the means for slowly closing it. Generally speaking the difference between the patented valve and the C 7 valve is that the former operates successfully and the latter does not; the one succeeded, the other failed; the one was tried and went into general use; the other was tried, found wanting and discarded. The reasons for this will be found when the differences

between them are understood. These may be summarized as follows: The C 7 valve did not have the following features of the patent: (1) A direct supply-port formed in the valve-seat. (2) The imperforate piston of the patent. (3) Means to secure reciprocal equalization of pressures between the chambers separated by the perforated piston. (4) An equalizing supply-port, under the control of the engineer, for the passage of air in either direction to establish and maintain absolute equilibrium while the device was in the running position. The valve C 7 did have the following features not found in the patent: (1) A perforated valvular abutment through which air could pass in one direction only. (2) A spring-seated check-valve located on the under side of the abutment and closing the apertures therein so that the pressure above must be sufficient to overcome the force of the spring before the air in the upper chamber can reach the lower chamber. (3) A valve-seat so constructed that dirt lodging there prevents the valve from closing, thus permitting the free passage of air from one side of the abutment to the other. (4) A stop-cock by which the device, in case it failed to operate, could be converted into an ordinary three-way cock. One of the complainant's experts tersely sums up his opinion of the two valves as follows:

"As to the value of differences between the two valves, there scarcely can be a comparison, for the reason that the C 7 valve is impractical and inoperative, and it is doubtful, if the railroads had to depend upon it, whether the quick-action brake or to-day could be used with any degree of certainty or usefulness; whereas the valve of the patent in suit is of the highest value, as it not only overcame all the existing difficulties, but afforded a reliable and practical means by which the quick-action brakes are made so useful and effective in handling the long and heavy trains of the present time. Furthermore, the valve of the patent in suit was the first in the art to fully and completely fulfill all the requirements found necessary in the manipulation of the quick-action brakes, and, therefore, its value is unquestioned when compared with all brake-valves preceding it."

The differences thus briefly outlined are radical and important. The changes made in the old valve were sufficient to transform a useless machine into a highly useful one. Conceding that the C 7 valve was presented to the public the court is unable to understand why the gift carried with it the subsequent improvements which made it a successful structure. Giving to everything legitimately in the prior art its full significance, nothing is found there which seriously limits the claims in the essential features upon which the invention rests.

As before stated the defendant's valve is made under the patent to Vaughan and McKee. In the specification they say:

"Briefly stated, as one broad feature of our invention, we combine with the train-pipe and valve-mechanism for opening and closing the exhaust therefrom, a controller, for effecting the exhaust closing movement of said valve-mechanism, comprising a chamber charged with fluid under pressure and closed during exhaust from train-pipe, and a movable body, such as a piston, subject to the train-pipe pressure on one side and to pressure from said chamber on the other, which movable body, under the reducing pressure in the train-pipe will be compelled to move by the pressure from said closed chamber and may be made to effect the exhaust closing movement of said valve-mechanism."

In appearance the defendant's valve is very different from the patented structure. It is a slide instead of a rotary valve, the piston moves horizontally instead of vertically, the cut-off valve is carried by a piston-lever and the other parts have been shifted, changed and rearranged, but on closer analysis it will be found that the essence of the invention is present. There is the equalized piston, having no perforations through it, to close the vent-port automatically and slowly and there is the direct passage from the main reservoir to the train-pipe. In fact, when a "service" or "graduated" application is used on a long train the operation is substantially identical with the device of the patent. An analysis of the fourth claim, for instance, will disclose a combination in an engineer's valve having the following elements: (1) A valve casing or chamber. (2) A main air-reservoir connection and a brake-pipe connection leading thereinto. (3) A direct supply-port formed in a valve-seat in the chamber and adapted to establish direct communication between said connections. (4) A movable abutment fitted to work in a chamber in the casing communicating on one side of the abutment with the brake-pipe connection. (5) A discharge-valve connected to said abutment and controlling a passage from the brake-pipe connection to the atmosphere. (6) An equalizing supply-port leading from the abutment-chamber to the valve-seat on the side of the abutment opposite to that which is open to the brake-pipe connection. (7) A regulating-valve working on the valve-seat and controlling the direct supply and equalizing ports. The claim being for a combination it is immaterial that some, or all, of the elements are found in prior structures unless they were assembled in an analogous combination.

There is no controversy regarding the elements of the claim except as to No. 6. The complainant insists that the equalizing supply-port is the passage marked 36 on the drawing and the defendant contends that it is the passage marked 32. The equalizing-port 36 is not found in the prior structures, it performs a function not performed by the coiled springs of those devices and maintains a perfect equality of train-pipe pressure above and below the piston when the train is running. At one end this passage opens into the chamber above the piston and at its other end communicates with passages leading to the chamber beneath the piston, and, as the complainant's expert admits, it "insures a substantial equality between the load on the valve and train-pipe pressure, even though the latter may vary more or less from normal while in running position, a function which is not performed by the spring in the B 11 valve." That this element —No. 6—is an equalizing supply-port is conceded and that it leads "from the abutment-chamber to the valve-seat on the side of the abutment opposite to that which is open to the brake-pipe connection" cannot be disputed. No reason is perceived why this element should be rejected and another substituted which renders the combination ineffectual for the accomplishment of the desired result. The port 32 is intended for recharging the supplemental reservoir. When this is done port 36 is also open and is performing its equalizing function on both sides of the piston. Port 32 does not do this, but does assist in the equalization of the main reservoir pressure through-

out the train-pipe. It is thought, therefore, that element No. 6 refers to port or passage 36. That elements 1, 2, 3, 6, as just construed, and 7 are found in the defendant's structure is too plain for argument. That 4 and 5 are also found there is clearly established. In the defendant's valve there is an imperforate piston working in a chamber and moving automatically to close the vent-valve gradually and thus secure equalization of train-pipe pressure. In function and result the two pistons are identical, the only difference being that the movement of one is perpendicular and of the other horizontal. Of course, such changes of form are wholly immaterial. The discharge-valve is also found in defendant's structure. This valve is moved laterally by the piston and slowly closes the passage to the atmosphere.· The eighth claim is the same as the fourth with an additional element added, namely, "a direct exhaust-passage leading from the valve-seat to the atmosphere." This exhaust-passage is found in the defendant's structure.

It is thought that the claims are valid and infringed.

The other claims, speaking generally, are repetitions of the fourth and eighth. In some instances unimportant features are omitted and · in others new features are included, but they all contain the essential elements of the invention, except the seventh, which omits all reference to the equalizing-piston and supply-port, which are features of fundamental importance. All of the claims, technically are infringed, but claim 7 is of doubtful validity, and claims 3, 6 and 9 do not seem necessary in addition to claims 4 and 8. These latter claims secure to the complainant every right to which it is entitled and the court, as now advised, can see little reason for including others. The courts have frequently expressed their disapprobation of multiplying claims unnecessarily and the complainant on reflection may be convinced that the course of wisdom and prudence requires the omission from the decree of all doubtful and unnecessary claims. This question need not be determined now, but may await the settlement of the decree. Westinghouse and Moore were the first to construct a perfectly reliable and highly efficient engineer's brake-valve. The features which combine to make the defendant's valve successful were appropriated directly from the patented structure.

The complainant is entitled to a decree.