WESTINGHOUSE AIR BRAKE CO. v. NEW YORK AIR BRAKE CO.

(Circuit Court of Appeals, Second Circuit. December 16, 1902.)

No. 33.

**1. PATENTS—CONSTRUCTION OF CLAIMS.**
When the language of a claim of a patent is clear and distinct, the patentee cannot claim anything beyond for the purpose of establishing infringement.

**2. SAME—INFRINGEMENT—EQUIVALENTS.**
The combination of an alleged infringing device is not that of the patent merely because it will do the same work in one of the several operations it is designed to effect in substantially the same way, and it does not infringe where it is not only structurally different, but performs the other operations in a substantially different way.

**3. SAME—ENGINEER'S VALVE FOR CONTROLLING AIR BRAKES.**
The Westinghouse & Moore patent, No. 401,916, for an improved engineer's brake valve, designed to provide for such gradual opening and closure of the valve which controls the discharge of air from the brake pipe as to cause a substantial equalization of pressure in such pipe and the uniform application of the brakes throughout the length of the train in making service stops, is in no sense a pioneer patent, but, in view of the prior art, must be limited to the precise construction shown, or its equivalent. Claims 4 and 8 construed, and *held* not infringed by the valve of the Vaughan & McKee patent, No. 504,290.

Appeal from the Circuit Court of the United States for the Northern District of New York.

Charles Neave and Frederick P. Fish, for appellant.
George H. Christy and Frederick H. Betts, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. This cause comes here upon an appeal of the defendant in the court below from a decree of the United States circuit court for the Northern district of New York sustaining claims 4 and 8 of patent No. 401,916, granted April 23, 1899, to George Westinghouse, Jr., and Frank Moore, for an engineer's brake valve. The railway automatic quick-action brake system with which this engineer's brake valve is connected has been fully discussed in prior decisions in this court. (C. C.) 59 Fed. 581; 11 C. C. A. 528, 63 Fed. 962; (C. C.) 65 Fed. 99; 16 C. C. A. 371, 69 Fed. 715; (C. C.) 77 Fed. 616; (C. C.) 112 Fed. 424. In this system the brakes on the train are released and held in their normal or running condition by means of fluid pressure, communicated from a main reservoir to the train pipe. An engineer's brake valve is mounted on the cab of the locomotive engine, and controls the passage of air between the main reservoir on the locomotive and the train pipe and triple-valve appliances throughout the train. The earlier engineer's brake valves were equipped with what was known as a "three-way cock." Patent No. 259,710, granted to N. J. Paradise in 1882, covers such a cock in connection with a spring valve for maintaining an excess of pressure in the main reservoir over that in the train pipe. In this device, when the engineer wished to release the brakes, he threw the handle of the cock

back to the extreme limit of its movement in one direction. This served to establish an unobstructed passage between the main reservoir and the train pipe, and the air rushing from the main reservoir into the train pipe charged it and its auxiliary reservoirs with compressed air, and released the brakes from the cars. When the required running pressure had been secured, the engineer, by a short forward movement of the handle, closed said direct passage, and opened an unobstructed passage through said excess pressure spring valve, which was so graduated as to compensate for train-pipe leakage, and allow the requisite amount of main-reservoir pressure to always feed through it, and keep the brakes in what is known as "running position." When the engineer wished to slow down or stop, he moved the valve handle still further forward, so as to close communication between the main reservoir and the train pipe, and to open the train pipe to the atmosphere, and permit escape to the air. This was known as the "service position" of the brakes. As soon, however, as the engineer thought that the train-pipe pressure had been sufficiently reduced by the resultant brake application, he moved the handle back a short distance, so as to close all the ports, and hold the brakes at the point at which they had already been set. This position was known as "lap position." When the engineer desired to make a quick application of the brakes, he moved the handle to the extreme limit of its forward travel, and this opened the train-pipe discharge passage to the atmosphere, causing a quick application of the brakes. This was known as "emergency position." That this three-way cock was practicable by the exercise of due care is shown by the testimony of Mr. H. Herman Westinghouse, one of complainant's witnesses, to the effect that his brother, one of the patentees herein, when descending a grade on an experimental 50-car train, and after the engineer had failed to properly apply the brakes "operated the engineer's valve in a way that effected a moderate and complete reduction throughout the entire train resulting in the setting of every brake, thereby causing a very material decrease in the speed. This gave an opportunity for releasing and restoring pressure to the reservoirs for further applications, so that the descent was conducted with entire safety, and at a very moderate rate of speed." Thus, in this device, the engineer, by moving the handle of the cock, was able to so vary the connections between the main reservoir and train pipe and the outer atmosphere as positively and directly to control the operation of the brakes, and to put them either in release, service, lap, or emergency positions. But the operation of this cock on long trains was attended with serious difficulties, especially in slowing down, or making of service or station stops. These difficulties arose from the fact that, when the engineer wished to slow down or make a service stop, he must open the valve for a short distance only, let out a comparatively small amount of air, and close the valve again. As a result of this action, the reduction of train-pipe pressure first became effective at the forward end of the train pipe, causing an application of the brakes in the forward cars, and thereafter the air surging or rushing forward from the rear portion of the train, and being unable to escape, accumulated in the forward end of the train pipes, and by reason of its momentum raised the pressure there,

thus releasing the forward brakes. In these circumstances the train was likely to be pulled in two, with serious resultant damage. As stated by counsel for complainant, the new problem was "to secure, in ordinary or 'service' stops with long trains, an approximately uniform reduction of train-pipe pressure throughout the length of the train pipe, so that there will be no release of brakes at the front end of the train, due to the forward surging of an appreciable excess of pressure over what then existed at the other end." It was found to be impracticable to rely upon the judgment of the engineer to so manipulate the valve that it would accommodate itself to the pressure of the surging air, varying by reason of differences in the speed and length of trains. It was, therefore, necessary, in slowing down or making service stops, to provide for an automatic slow closing of the engineer's valve after the requisite amount of air had been discharged. That the patent in suit covers a means for accomplishing this object which is practical and successful, is proved. But defendant contends that the objections referred to were also obviated by the prior valves known as "B12" and "C7" engineer's valves, made and sold by the Westinghouse Company, and that C7 was a practical valve, and embodied all the essential elements of the patent in suit. It is only necessary to consider the C7 valve, which was the later and simpler of the two. The evidence as to its commercial success is conflicting and inconclusive. During the years 1887 and 1888 complainant sold 2,116 of said valves, of which more than one-half were returned. It was operative, however, when in proper condition, was successfully used, with slight modifications, by complainant, on an exhibition train of 50 cars, and was in practical use on railway trains for nearly 10 years. Defendant's expert admits that its practical operation was subject to certain disturbing influences, and that "the remedy for obviating or preventing such disturbing influences to a sufficient extent was embodied in the valve of the patent in suit."

The objects of the invention of the patent in suit, as stated in the specification, were as follows:

"Primarily, to provide for such gradual opening and closure of the valve which controls the discharge of air from the brake pipe as to cause a substantial equalization of pressure in the brake pipe and uniform application of the brakes throughout the length of the train, and obviate the liability to release the brakes on the forward cars in long trains, which has heretofore been found to be induced by an inequality of pressure in the brake pipe, occasioned by the quick release of a considerable quantity of air and the sudden closure of the discharge valve thereafter, and from which the breaking of the train into two or more sections has sometimes resulted. A further object of our invention is to effect a simplification of structure, and prevent the access to the valve-operating piston of grease or other foreign matter tending to clog or interfere with its free and normal movements."

Claims 4 and 8 are as follows:

"(4) In an engineer's brake valve, the combination of a valve casing or chamber; a main air-reservoir connection and a brake-pipe connection leading thereinto; a direct supply port formed in a valve seat in the chamber, and adapted to establish direct communication between said connections; a movable abutment fitted to work in a chamber in the casing, communicating on one side of the abutment with the brake-pipe connection; a discharge valve connected to said abutment, and controlling a passage from the brake-pipe connection to the atmosphere; an equalizing supply port leading from the

abutment chamber to the valve seat on the side of the abutment opposite to that which is open to the brake-pipe connection; and a regulating valve working on the valve seat, and controlling the direct supply and equalizing ports, substantially as set forth."

"(8) In an engineer's brake valve, the combination of a valve casing or chamber; a main air-reservoir connection and a brake-pipe connection leading thereinto; a direct supply port formed in a valve seat in the chamber, and adapted to establish direct communication between said connections; a direct exhaust passage leading from the valve seat to the atmosphere; a discharge valve controlling an independent exhaust passage from the brake-pipe connection; a movable abutment connected to the discharge valve; and a regulating valve controlling ports by which, respectively, an equilibrium of pressure is established, and a difference of pressure is effected on opposite sides of the abutment, and also controlling communication between the direct supply port and the brake-pipe connection and between the brake connection and the direct exhaust passage, substantially as set forth."

## The C7 Equalizing Valve—Service Position.

## The Valve of the Patent—Service Position.

The above drawings illustrate the construction and operation of the C7 valve and of the patent in suit. They employ the same general combination of air ducts, ports, and controlling devices to do the work required of an engineer's valve to effect the several brake operations already referred to. In each there is a regulating valve chamber, 1, and regulating valve, 5, governing the several ports in the valve seat. Each is provided with the main-reservoir connection, 17, and the train-pipe connection, 18, through which compressed air passes from the main reservoir through said chamber and valve to the brake pipe throughout the train. Each has the small service discharge passage from the brake pipe, 23, separate from and independent of the large emergency discharge passage, 29–39. Each has the service discharge valve, 21, which closes the service discharge passage, 23, and a movable abutment or piston, 19, connected with said discharge valve, which slowly and automatically closes said valve 21. Each has a supplemental reservoir, 26, and the exhaust port, 38, leading to the atmosphere from the upper or supplemental reservoir side of the piston, 19. Each has a passage, 32, shown, but not numbered. The three essential differences between the two devices are the following: The C7 valve has a perforated valvular abutment or piston, 19, while said valve in the patent in suit is imperforate. The passage from the main reservoir to the train pipe in C7 is intercepted by the perforated valve, 19, through which the compressed air must pass in order to reach the train pipe. In the patent in suit the passage from the main reservoir to the train pipe is a direct one around the abutment chamber, and is not intercepted by a valve. There are two equalizing ports, 36 and 32, through which air is admitted to the top of the abutment. The port 36 is not found in the C7 valve. The C7 device employed a spring to keep the valve, 20, on its seat. The patent in suit dispensed with this spring, and by means of said port 36, in connection with other ports, provided an equilibrium of air pressure on the abutment, 19. The result of these changes was to accomplish what is stated in the specification of the patent in suit to be the "further object" of the invention, namely, "to effect a simplification of structure and prevent the access to the valve-operating piston of grease or other foreign matter tending to clog or interfere with its free and normal movements." It consisted in dispensing with the perforated piston of the C7 valve by employing an air duct leading directly from the main reservoir to the lower side of the piston, instead of leading through the piston; thus simplifying the structure. Pistons without perforations were old in fluid pressure devices, and the invention of the patent consists in such a reorganization of the C7 valve as to bring the other appliances into co-operative relations with such a piston, and enable the apparatus to do its work in the several brake applications, which it must be able to effect in order to accomplish what is stated to be, primarily, the object of the invention.

The patent in suit, therefore, is in no sense a pioneer patent. What is stated in the specification to be primarily the object of the invention had previously been accomplished. The object of the invention had been accomplished by the careful use of the old three-way cock, and it had been accomplished by the prior C7 valve, and practically as

efficiently, when that valve was in perfect working order. The defendant was at liberty to embody any arrangement of air ducts, ports, and controlling devices to do this work, except the combination of the patent, or equivalent parts so constructed and arranged as to do their work in substantially the same way as those of the patent. The "substantial equalization of pressure" thus utilized to balance and control a piston had been previously covered by George Westinghouse, one of the patentees herein, in prior patents granted to him for improvements in fluid-pressure brake mechanism, as will appear by reference to prior decisions between these parties (C. C.) 59 Fed. 581; 11 C. C. A. 528, 63 Fed. 962.

### Defendant's Valve—Service Position.

The defendant's engineer's valve device shown in above drawing is constructed under patent No. 504,290, granted August 29, 1893, to Vaughan & McKee. In certain minor and immaterial details of construction it differs from the valves of C7 and the patent in suit. Thus it has a main slide valve and horizontally moving piston, while complainant uses a rotary valve and poppet piston. In common with them it comprises valves, passages, ports, and a piston for regulating the operation of brakes. It has a "direct supply port, 28, formed in the valve-seat" of the patent in suit, not found in C7, through which the air passes from the main reservoir to the train pipe. This improvement of the patent in suit involved invention, and defendant's construction is its equivalent. The valve, 21, is connected by a pivoted lever with the stem, 20, of the piston, 19. The air chamber on the left of said piston communicates with the train pipe at 18. On the right of said piston it communicates with supplemental reservoir, 26. The radical differences in the principle, organization, and operation of the two structures will be best understood by a comparison of the differences in their operation. In release position in each device the handle, 7, is fixed at A, and a direct passage is opened through the port, 28, formed in the valve seat between main reservoir and train pipe. In the patented device air is admitted also to the top of the piston through pass-

ages, 31 and 32 (shown, but not numbered), in order to hold the discharge valve, 21, to its seat, and keep the discharge passage, 28, closed against the escape of air. In defendant's device in this position the discharge valve, 21, does not close the discharge passage, 23. It is closed by the seat of the main valve. In defendant's device air is being discharged from supplemental reservoir, 26, through ports 36 and 38, to the atmosphere. In order to pass the running position in each device the handle, 7, is moved to B. This movement brings the main valve, 5, across the port 28, and cuts off direct communication between main reservoir and train pipe, and valve 5 opens said communication through certain smaller passages, not numbered, and not necessary to be here considered, one of which is intercepted by a check valve, and thereby establishes an equilibrium of air pressure on opposite sides of the piston, 19. By this operation the brakes are kept in running position, as in the three-way cock and C7 devices. In the patented device in this position air pressure above the piston, 19, must hold the valve 21 to its seat in order to keep passage 23 closed. In defendant's device the passage 23 is closed at the extreme left by the main valve seat. That valve 21 covers it on the right is, therefore, practically immaterial. In order to make a service application in complainant's device, the handle, 7, is first moved to the further side of the two positions shown at C. Thereby main valve, 5, opens an exhaust, 38, through port 32, shown at the right of 38, but not numbered, above the piston, 19, to the atmosphere; the excess of pressure below the piston, thus induced, causing valve 21 to rise from its seat and open the discharge passage 23, and permit air to pass from the train pipe to the atmosphere. When the engineer thinks that the reduction of pressure above the piston and in the supplemental reservoir required to make the suitable brake application has been accomplished, he moves the handle back to the nearer or left position shown at C, known as the "lap position," thereby closing the exhaust, 38. The valve 21 is then slowly and automatically forced back on its seat as a result of the gradually diminishing brake-pipe pressure below and the gradually increasing reservoir pressure above the piston, 19. This combination of forward movement to "service" and backward movement to "lap" was characteristic of the C7 device. Defendant does not and cannot employ this combination movement. In its device the engineer, in order to make a service application, moves the handle to one of several notches indicated on a dial graduated to provide for varying requirements of service, and leaves it there. This positive movement of the main valve, 5, directly opens the train pipe to the atmosphere through exhaust 38, and closes the port 36. As a result of this positive movement, the air, passes out from the train pipe and the chamber on the left of the piston, 19, through 38; and the excess of pressure of the air passing from the supplemental reservoir into the chamber on the right of the piston gradually moves it towards the left. The lever connecting the piston and valve 21 being thus moved, causes valve 21 to move toward the right until, as the pressure on the left of the piston continues to decrease, the valve closes said train-pipe discharge passage. Valve 21 does not open the train-pipe discharge pass-

age. It is unnecessary to discuss the operation of the devices in emergency applications.

The problem presented was to provide such an improvement of the three-way cock and C7 devices, which were practicable when skillfully handled, that it could be operated by the ordinary engineer. The inventors of the device in suit solved the problem by an organization which trusted the judgment of the engineer in making forward and subsequent backward movements of the main valve for service applications. The result of this movement was to create and disturb equilibriums of pressure which caused both a gradual opening and gradual closing of a discharge passage by means of a discharge valve. The operation of this discharge valve is essential to every operation of the patented device. Its whole mechanism is designed to secure equilibrium of pressure, and to keep the valve on its seat in the release and running positions. Its characteristic feature is indirect operation accomplished by reliance on air pressure. In defendant's device the engineer is only trusted to exercise his judgment to select one of several service graduations to which he shall move the handle of his main valve. Said movement does not depend on any equilibrium of air pressure to gradually open and close a discharge valve, but it positively and directly opens a discharge passage. Defendant's discharge valve never opens any passage and never closes any passage except in service position. When defendant's device is in release position, any air which may be on the right side of the piston is passing out, so that the piston may be in its normal position, and ready to work. Air pressure does not hold the valve to its seat, because the air is passing out without affecting its position. The characteristic feature of defendant's device is direct, positive operation, accomplished by a direct movement of the main regulating valve. There are radical differences, therefore, between the patented device and that of defendant in theory, object, organization, and operation.

In view of the prior art, the complainant must be limited to the precise construction patented by him or its equivalent. The question is whether defendant employs the controlling devices of the patent. The piston and discharge valves are elements of the claims in controversy. The piston and discharge valve of the patent is an integral structure, and the valve is carried on a stem of the piston to and from a passage leading from the train-pipe exhaust connection to the atmosphere, and opens and closes that passage. The passage must always be opened or closed, and must be opened and closed at exactly the appropriate moment in an application of the brakes, and it is opened and closed only by the valve; consequently, the piston and valve are always doing this work of opening or closing the passage. The piston is the piston of the C7 valve minus the perforations, and the discharge valve is that of the C7 valve. This valve does its work at the same place and in the same way, being actuated by air pressure upon the piston. There is no similarity in structure and details of arrangement between the piston and valve of the defendant's device and those of the patent, and, if it embodies them, it is because valve 21 and piston 19, are so constructed and arranged in relation to one another and

119 F.—56

the other parts of the combination that they are equivalents of those devices in the patent. In the defendant's apparatus the discharge valve is not integral with the piston, or connected to any abutment, but is actuated by the lever connected with the piston. The valve, when in its normal position, does not close the train-pipe exhaust passage, and cannot open that passage. Both of these things are done by the main slide valve, 5. When the passage is opened by the main slide valve, valve 21 may move so as to cover the passage; but said passage is so closed in release and running positions not because of the presence of the valve, but because the end of the passage 23 has come over the center of the main slide valve. The passage is opened directly by the main valve, and not by any discharge valve carried by the piston, and it is thereafter closed by the movement of the piston, which takes up a series of new positions, stopping automatically at predetermined positions for brake applications. In the apparatus of the patent the valve 21 controls both the opening and the closing of the train-pipe discharge passage, and insures a slow and gradual opening as well as a slow and gradual closing of that passage. One of the stated objects of the patent is to provide for "gradual opening." In the defendant's apparatus there is no provision by means of which the piston may, in any case, effect a slow opening of this passage, but the passage is opened by the direct movement of the valve handle, and not by any movement of any valve controlled by the piston. In the release application of the brakes, defendant's piston, 19, and its valve 21 do not in any way control any passage whatever; nor do they in the running application. In the service application they do. The fourth claim covers, inter alia, "an equalizing supply port leading from the abutment chamber to the valve seat on the side of the abutment opposite to that which is open to the brake-pipe connection." Two ports are shown in the drawing, to either of which this description might apply, the ports 32 and 36. Such an equalizing port was not necessary in the C7 device, because there the air charged into the train pipe first passed into the chamber above the perforated piston, and the discharge valve was kept seated by the preponderance of pressure above the piston. But by reason of the "direct passage" improvement of the patent in suit upon C7, the air would have passed through the direct supply port, 28, to the lower side of the piston, 19, and would have raised the valve 21 from its seat, so as to allow the escape of air, and prevent the operation of the device, as already explained, unless an equalizing port were provided leading to the upper side of the piston to counterbalance the pressure below and keep the discharge valve on its seat. The location of this equalizing port is shown by the following description of the release position in the specification:

"A direct passage is thus afforded for air from the main reservoir to the brake pipe to effect the release of the brakes and the succeeding recharging of the auxiliary reservoirs. At the same time communication is established, through a smaller port, 31, in the valve, and an equalizing supply-port, 32, in the valve-seat, between the main air-reservoir and the chamber 24, above the piston and connected supplementary chamber, 26, equilibrium of pressure in the chamber above and below the piston being thereby established and the discharge valve held to its seat."

And its function is shown in the foregoing and following further description in the specification of the release position where communication is established:

"Between the main air reservoir and the chamber above the piston, in order to charge said chamber and its connected supplemental chamber with air at a pressure equal to that in the brake pipe, and thereby to institute an equilibrium of pressure on both sides of the piston, and hold the discharge valve to its seat."

The defendant has no such port, and its device performs no such function. The defendant's device is provided with a single port, marked 36 in the drawings, which it is contended infringes the complainant's port 36. As to this port defendant's expert makes the following admission:

"Said passage, H [36] in defendant's valve in the running position does serve to maintain an equality in pressure between the train pipe and the small reservoir, 155 [26], by affording direct communication between them; and, so far as its relation to said elements, train pipe and small reservoir, is concerned, I should regard it as the equivalent for the second equalizing port, 36, of the patent in suit, in its relation to the train-pipe and supplemental reservoir."

This port also permits at the same time—that is, in running position—free communication between the supplemental reservoir, 26, and on the right side; that is, "the side of the abutment opposite to that which is open to the brake-pipe connection." Port 32 permits such communication in release position. Each thus serves to produce equality of pressure. But defendant contends that the equalizing port of the fourth claim is port 32, and not port 36. The question is whether the language of the fourth claim can be so construed as to refer to port 36 of the patent. This question must be answered in the negative for the following reasons: (1) The port of the fourth claim is "a supply port, leading from the abutment chamber to the valve seat on the side of the abutment opposite to that which is open to the brake-pipe connection." Port 32 is described in the specification as "an equalizing supply port, 32, * * * equilibrium of pressure in the chamber above and below the piston being thereby established, and the discharge valve held to its seat." (2) The function of port 32, as stated in the specification, is "to institute an equilibrium of pressure, and hold the discharge valve to its seat." Port 36 is described in the specification and claimed in claim 5 as "a secondary equalizing port, 36," and its function is twice stated to be to maintain an equalization of pressure. (3) But of the two equalizing ports of the patent port, 32, is the one which deals with the supply of pressure directly from the main reservoir. It is the one which first and "at the same time" institutes equality of pressure as the brakes are released. Port 36, on the other hand, only secondarily serves to maintain the pressure originally supplied by port 32, and it does this not directly from the main reservoir, but indirectly after the pressure has passed by the check valve, and through passages 34 and 29. The expert for complainant admits that it is "not an essential communication perhaps, but an unobjectionable one."

Complainant contends that the secondary equalizing port, 36, is the port of particular importance, for various reasons, and therefore that the court should so interpret the claim as to hold that it covers port 32, instead of port 36. But while this court may resort to the language of the specification for the purpose of interpreting the claim, it cannot read into such claim elements not specifically covered thereby, especially where to do so would be to contradict the clear and definite statement in the specification. When the terms of the claim are clear anu distinct, the patentee cannot claim anything beyond for the purpose of establishing infringement. Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 24 L. Ed. 344; Merrill v. Yeomans, 94 U. S. 568, 24 L. Ed. 235; McCarty v. Railroad Co., 160 U. S. 110, 16 Sup. Ct. 240, 40 L. Ed. 358. As was said in White v. Dunbar, 119 U. S. 47, 7 Sup. Ct. 72, 30 L. Ed. 303:

"It is an injustice to the public, as well as an invasion of the law, to construe it [the claim] in any manner different from the plain import of its words."

The fourth claim is not infringed.

A more difficult question arises as to the infringement of claim 8. This is a broad claim, covering the elements of the patented combination concerned in the release, service, and emergency operations. It covers, inter alia, a main regulating valve, 5, "controlling ports by which, respectively, an equilibrium of pressure is established, and a difference of pressure is effected on opposite sides of the abutment." The object of this construction, as shown in the specification, is to keep the ports open or closed by varying the equilibrium of pressure on the opposite sides of the piston. It is effected through the operations of the main valve in so changing the preponderance of pressure on the opposite sides of the piston that through its discharge valve, 21, it shall control the service discharge passage. It is clear that defendant's main regulating valve does not thus control such ports. The positive movement of said valve directly opens the passage. The differences in the organization of the two structures are substantial, and cause radically different modes of operation. In view of the secondary character of the patented invention, the claims in suit cannot be so extended or perverted as to cover the defendant's device.

Disregarding the differences of form and structure and details of arrangement, the combination of the defendant's apparatus is not that of the claims of the patent merely because it will do the same work in one of the several operations which it is devised to effect. If it be conceded that it will do that work in substantially the same way, infringement is not thereby established. Substantial identity between the combinations must be found in their capacity to do the same work in substantially the same way, and it does not suffice to show that they will do one part of their work, viz., perform one application of the brakes, in substantially the same way. The argument for the complainant seems to proceed upon the theory that the combinations are substantially the same because each will perform the several operations of the system, and each is composed of essentially the same dev es. The answer is that the differences in organization introduce different

modes of operation except in a single instance, and the identity is incomplete, being partial, instead of general.

The decree is reversed, with costs, with directions to the court below to dismiss the bill.