### UNION CARBIDE CO. v. AMERICAN CARBIDE CO.

(Circuit Court, N. D. New York. August 2, 1909.)

1. PATENTS (§ 75*)—PRIOR PUBLIC USE—WHAT CONSTITUTES—EXPERIMENTAL USE.

An experimental use of a new invention or discovery, which will not defeat the right of the inventor to a patent unless application is made within two years, must have been in perfecting the invention, and where the discoverer of a new form of calcium carbide, who made a considerable quantity, used the same in experiments in making acetylene gas, etc., not for the purpose of perfecting it, but to demonstrate its commercial value, and also sent a quantity abroad without injunctions of secrecy or restrictions upon its use, where it was used for like pur-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

poses, such use constituted a public use or disclosure within the meaning of the law.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 95; Dec. Dig. § 75.*

Priority and continuance of public use of invention as affecting patentability, see note to Eastman v. Mayor, etc., of City of New York, 69 C. C. A. 646.]

2. PATENTS (§ 110*)—PRIOR PUBLIC USE—TIME OF APPLICATION—SUCCESSIVE APPLICATIONS.

The discoverer of a new form of a chemical product made an application for a broad patent thereon, which was rejected, and he afterward, but more than two years after his product had been in public use, made a new application for a more limited patent, which after various amendments was granted. *Held*, that the second application was a continuation of the first in such sense as to take the case out of the limitation of the statute; the product which was the subject of both applications being the same.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 153; Dec. Dig. § 110.*]

3. PATENTS (§ 328*)—VALIDITY—INFRINGEMENT—CRYSTALLINE CALCIUM CARBIDE.

The Willson patent, No. 541,138, covering "as a new product crystalline calcium carbide existing as masses of aggregated crystals," is valid, but is limited to the one form of crystalline carbide "existing in masses of aggregated crystals," and does not include other forms which had been previously produced. As so construed, *held* not infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit for alleged infringement of United States letters patent No. 541,138, to Thomas L. Willson, dated June 18, 1895, for an alleged new product existing in the form of crystalline calcium carbide, and for an accounting.

Louis C. Raegener, for complainant.

Kernan & Kernan (Charles Neave and Willis Fowler, of counsel), for defendant.

RAY, District Judge. The claim of the patent in suit, No. 541,138, dated June 18, 1895, application filed March 4, 1895, and granted to Thomas L. Willson, for "product existing in form of crystalline calcium carbide," reads as follows:

"As a new product crystalline calcium carbide existing as masses of aggregated crystals, substantially as described."

The patent says:

"This invention relates to the production of a new form of crystalline calcium carbide. Before my invention, calcium carbide has existed in an amorphous condition, due either to the method of its preparation, or to the impurities contained in it. By my invention herein described, calcium carbide is produced in a new form, namely, in crystalline condition, having a bluish or purplish iridescence. The carbide so existing is in a condition particularly applicable, on account of its purity, for conversion into other compounds."

The patentee then describes his process, and then says:

"The liquid calcium carbide thus produced, when allowed to cool, crystallizes into the form above described, and when broken exhibits the iridescent surfaces above named."

He then states that by his process the yield of calcium carbide per electric horse power is almost doubled over a process of using direct current, etc. He then describes the mode of preparing the material, etc. He also says in the very beginning of his specifications:

"I have invented a new and useful product existing in the form of crystalline calcium carbide."

One is impressed with the idea that the patentee claims to have invented a new product which in the claim he says is "crystalline calcium carbide existing as masses of aggregated crystals." He, as seen, expressly states that his invention relates to the production of a "new form of crystalline calcium carbide." That form is emphasized in the claim as "existing as masses of aggregated crystals," and to repeat:

"By my invention herein described, calcium carbide is produced in a new form, namely, in crystalline condition having a bluish or purplish iridescence."

The quality contended for is greater purity, and therefore greater adaptability for conversion into other compounds.

If "crystalline calcium carbide existing as masses of aggregated crystals" of the form and quality substantially as described, viz., a "crystalline condition," was old, then we have no new product. The patent on its face admits that calcium carbide had existed in an "amorphous" condition—that is, having no determinate form, no regular structure, not crystallized, having no particular form or shape—but claims that the patentee has produced a calcium carbide "existing in masses of aggregated crystals," therefore crystallized, and that, existing in the new form, it possesses greater purity and is therefore better adapted for conversion into other compounds. If this product did not exist before, and Willson did produce it, utility must be conceded. This is the patent, and this the claim, and no matter what Willson invented or produced, if he has not described and claimed it, his patent cannot be upheld. This has become elementary in patent law, and the subject will be referred to later.

The defendant urges three grounds of invalidity, viz.:

"First, because, even assuming that the prior calcium carbides were amorphous, there is no patentable novelty in the crystalline form whether or not existing as masses of aggregated crystals.

"Second, because, if the claim is for crystalline calcium carbide (and is not modified by the words 'existing as masses of aggregated crystals'), it is directly anticipated by the Woehler calcium carbide which, we contend, was crystalline.

"And, further, the patent is invalid because, as we point out at pages 57–66, infra, if Willson's story is to be believed, the claimed product was in public use or on sale for more than two years prior to filing the application for the patent in suit."

The defendant also insists that it does not produce "calcium carbide existing as masses of aggregated crystals," and therefore does not infringe; but suppose it true that calcium carbide before Willson existed only in an "amorphous condition"—that is, "not crystallized"—and defendant produces it in a crystallized condition, and of the necessary purity, even if it does not always exist "as masses of aggregated crystals," does it not infringe? Is the existence of defendant's product

in masses of aggregated crystals essential to constitute infringement if it produces it in the crystallized form as distinguished from the amorphous form and it only existed in the amorphous form before? What is the essence of the Willson invention if there be invention? Is it calcium carbide crystallized, or is it calcium carbide existing as masses of aggregated crystals? The defendant insists that the claim must be narrowly construed to embrace only that specific form of crystalline calcium carbide which exists as masses of aggregated crystals, and that it is not a claim for crystalline calcium carbide or for calcium carbide. The defendant insists that the claim as originally made was rejected, and rejected again after amendment, and only allowed when the words, or limitation, "existing as masses of aggregated crystals," were inserted.

It is conceded that after Willson made his invention, whatever it was, that he applied for a patent for calcium carbide broadly and was rejected. He then filed the claim in suit. The first application was filed March 16, 1893, and the claim read:

"The new product hereinbefore described; the same being a carbide of calcium with or without metallic calcium."

The file wrapper of this patent shows that the original claim filed March 4, 1895, read as follows:

"As a new product, crystalline calcium carbide having a bluish iridescence, substantially as described.‘

That this claim was rejected March 19, 1895, on:

"U. S. 492,377, Feb. 21, 1893, Willson (Fused Bath Aluminum); Comptes rendus, vol. 119, p. 16, July 2, 1894; Roscoe & Schorlemmer's Treatise on Chemistry, vol. 3, part 2, Manchester 1884, p. 445 (455). Comptes rendus, vol. 119, refers to calcium carbide as crystalline."

Thereupon, May 8, 1895, Willson, by E. N. Dickerson, his attorney, filed the following communication and affidavits:

"To the Hon. Commissioner of Patents—

"Sir: I amend this case as follows:

"Amend claim 1 by adding after the words 'calcium carbide' the words 'existing as masses of aggregated crystals.'

"Add the following claim:

"2. As a new product, crystalline calcium carbide existing as masses of aggregated crystals, substantially as described.

"A sample is furnished herewith.

"It is respectfully insisted that the references do not meet the claims. There is no description of crystalline calcium carbide in Willson's 1893 patent, or in Roscoe and Schorlemmer. An affidavit filed herewith antedates the publication in the Comptes Rendus of July 2, 1894.

"So far as the present first claim is concerned, there is the additional distinction of the peculiar bluish iridescence obtained by Mr. Willson's process, and not to be found in any of the anticipating references.

"Respectfully,                E. N. Dickerson, Atty. for T. L. Willson.
"May 8, 1895.

"City of Washington, District of Columbia—ss.:

"Thomas L. Willson, being duly sworn, deposes and says: I am the applicant in the above-entitled application. Previous to July, 1894, I had practically produced crystalline calcium carbide on a large scale in the United States. I had previously produced several tons of such material, and I had more than

a ton of such material in New York at that time. This fact, if desired, can be verified by affidavits of numerous witnesses.

"Thomas L. Willson.

"Sworn to and subscribed before me this eighth day of May. A. D. 1895.
"[Notarial Seal]        W. Clarence Duvall, Notary Public."

"City of Washington, District of Columbia—ss.:

"Thomas L. Willson, being duly sworn, deposes and says: That he is the applicant in the above-entitled application, and that he executed an affidavit in said application dated the 8th day of May, 1895, in which he stated that he had practically produced crystalline calcium carbide on a large scale in the United States prior to a certain date. He now reiterates that statement and supplements it with the statement that prior to September, 1892, he had produced crystalline calcium carbide in practical quantities, and in September, 1892, he sent a quantity of it to Lord Kelvin, at Glasgow, Scotland. This crystalline calcium carbide was produced, broadly stated, by subjecting calcium oxide with carbon to the action of an electric arc, using an electric current of about thirty-five bolts and two thousand amperes. The crystalline calcium carbide produced thereby has the formula $CaC_2$. Since that time deponent has been constantly engaged in practically producing this crystalline calcium carbide, and has produced it in large quantities and on a commercial scale. And further deponent saith not.

"Thomas L. Willson.

"Sworn to and subscribed before me this ninth day of May, A. D. 1895.
"[Notarial Seal]        W. Clarence Duvall, Notary Public."

Thereupon the commissioner held that there was no patentable difference between the old claim as amended and the new claim, as the only difference in the wording was that the old claim as amended retained the words "having a bluish iridescence," which were omitted from the new and added claim. Thereupon Willson, by his attorney, struck out claim 1 as amended, leaving the new claim, and this was allowed. The old claim, claim 1, as amended, read as follows:

"1. As a new product, crystalline calcium carbide existing as masses of aggregated crystals having a bluish iridescence, substantially as described."

And the added claim read:

"2. As a new product, crystalline calcium carbide existing as masses of aggregated crystals, substantially as described."

Claim 1 being struck out, 2 remained and was allowed. This was a change which followed the rejection based on the statement that prior publications showed that calcium carbide existed as crystalline. The change was the insertion of the words in the new claim, as in the old, "existing as masses of aggregated crystals." Is this a self-imposed limitation, in view of the action of the Patent Office? Is it a limitation imposed by the Patent Office and acquiesced in by the applicant in order to obtain his patent. The change and modification or limitation of the claim certainly followed the action of the Patent Office. The words "existing as masses of aggregated crystals" cannot be held to be meaningless. It may be a disputed and disputable question whether the claim was allowed because of the affidavits presented to the Patent Office, or because of the limitation put in the claim. Clearly the limitation was put in the claim to avoid the objection of the commissioner of patents. It is equally clear that this patent is not for "crystalline calcium carbide in all its forms." The patent on its face recognizes the prior existence of crystalline calcium carbide, and expressly says:

"This invention relates to the production of a new form of crystalline calcium carbide.   *   *   *   By my invention herein described, calcium carbide is produced in a new form, namely, in crystall⸢…⸣ condition having a bluish or purplish iridescence."

The patent expressly names crystalline calcium carbide as pre-existing, and states that the invention has to do with "a new form" thereof, and that this new form of the product has "a bluish or purplish iridescence," and in the claim the patent says it exists "as masses of aggregated crystals." This has to do with form. What impresses me is: If Willson supposed he had found or made crystalline calcium carbide as a new product, why did he not say so and adhere to his claim? Why did he say that his invention relates to "a new form of crystalline calcium carbide?" How can there be a "new form" of a thing in the absence of the thing itself? "Crystalline" is thus defined by the Century Dictionary:

"Consisting of crystal, relating or pertaining to crystals or crystallization, formed by crystallization; of the nature of a crystal, especially as regards its internal structure, cleavage, etc.—opposed to amorphous."

It seems to me plain on the face of the patent, in connection with the file wrappers of his previous applications, that during the prior proceedings in the Patent Office, resulting in the final rejection of the claim for calcium carbide broadly, Willson had become informed that crystalline calcium carbide existed and was known prior to the date of his invention, and that after the rejection of his claims he made up his mind that he had discovered, produced, and invented " a new form" of crystalline calcium carbide, one having a peculiar iridescence and existing as masses of aggregated crystals, and therefore first claimed the new form of crystalline calcium carbide having a bluish or purplish iridescence, and later made his description of this new form of crystalline calcium carbide more specific by inserting in the claim the particular form in which it existed as claimed by him to be a new product. I can account for the presence of these descriptive and limiting words in no other way.

About August 5, 1892, Willson filed an application for a process patent, "electric reduction of refractory compounds," in which he described his use of the electric arc, his present process, and said therein, referring to the electric arc:

"I have already employed it for reducing calcium oxide and producing calcium carbide."

Did he then know he had produced crystalline calcium carbide? If so, why did he not so state, and why, in his application filed March 16, 1893, did he not claim crystalline carbide?

In November, 1899, Moissan published an article, "Researches on Calcium and Its Compounds," in which he says:

"At the temperature of the electric furnace, the lime is thus reduced by the carbon under the formation of calcium vapors. If there is, in the presence of this vapor, solid or gaseous carbon, there is at once produced calcium carbide. In the presence of oxide of carbon, or of carbonic acid, there will be formed a mixture of oxide and of calcium carbide. These different reactions have an importance for the study of the industrial preparation of calcium carbide."

It is apparent from this and other publications and evidence that calcium carbide had been produced by the electric current in a suitable furnace as early as 1899, by others.

It is evident that Willson used the words "crystalline calcium carbide" in opposition to the words "amorphous calcium carbide." In fact he so states in substance. In 1891, D. H. Williams published in New York "Elements of Crystallography." He describes and illustrates "crystal aggregate" and "crystalline aggregate." He says:

"That portion of a homogeneous crystallized substance whose molecular arrangement is throughout the same along all parallel lines, and which is bounded by its own characteristic plane surface, is called a crystal individual. Such an individual is not of necessity completely bounded by crystal planes, since there is generally a larger or smaller point of attachment to other crystals. There must, however, be enough planes to allow of the restoration of the complete form. Anything less than this is a crystal fragment or grain.

"The union of two or more crystal individuals produces a crystal aggregate; while a mass of crystal grains, devoid of their characteristic forms and closely packed together, may be termed a crystalline aggregate."

We may therefore have at least two forms of crystalline calcium carbide—that existing in the form of crystal aggregates, or, what is the same thing, that existing as aggregated crystals, and this may be in masses, and that existing in the form of crystalline aggregates. The distinction exists and existed in 1891, long before Willson claims to have made his invention or discovery. He is presumed to have known the distinction. The same idea of the formation of crystals and crystalline bodies is expressed in volume 5, American Cyclopedia [Ed. 1881], under "Crystallography." It is there stated:

"(11) While simple and twin crystals form when circumstances are favorable, in other cases the solidifying material becomes an aggregate of crystalline particles. Regular crystals often require for their formation the nicest adjustment of circumstances as to supply of material, temperature, rate of cooling, or evaporation, etc.; and hence imperfect crystallizations are far the most common in nature. A weak solution spread over a surface may produce a deposit of minute crystals, which, if the solution continues to be gradually supplied, will slowly lengthen, and produce a fibrous or columnar structure. In other cases, whether crystallization take place from solution, or fusion, or otherwise, the result is only a confused aggregate of grains, or the granular structure."

On the final hearing the position and claim of the complainant was that the words "existing as masses of aggregated crystals" in the claim of the patent is mere tautology; that they add nothing to the claim and detract nothing. This assumes that all crystalline calcium carbide exists as masses of aggregated crystals, and in no other form, and that the distinction made by Williams in the forms of crystalline bodies has no application to crystalline calcium carbide. If so, why did Willson insert the words in the original claim, and why did he add a new claim after the old one was rejected containing them? Was it to announce the alleged fact that he had invented or discovered a "new form" of "crystalline" calcium carbide, and that his "new form" of "crystalline" calcium carbide always existed as "masses of aggregated crystals?" By implication Willson says in his specifications of the patent in suit that calcium carbide has theretofore existed, so far as

known, in the amorphous condition only; that is, not in a crystalline condition.

I am of the opinion and hold under the weight of evidence that crystalline calcium carbide, as Willson understood it, exists in at least two forms—not referring to the amorphous condition, which is not crystalline in any sense, but the opposite.

In Willson's British patent of 1894, No. 16,342, he said:

"The product of this invention is distinguished from calcium carbide previously produced in minute quantities for laboratory experiments, in that it is crystalline existing in masses of aggregated crystals," etc.

It is evident that this is the form he had in mind as his production. Whitlock, defendant's witness, says:

"In my opinion the assemblage designated by Williams as a 'crystal aggregate' represents a mass of aggregated crystals and is distinct from a 'crystalline aggregate.' A crystal aggregate, or in other words, a mass of aggregated crystals, is necessarily crystalline, since the latter term includes the former. A mass of aggregated crystals, is then a particular form of a crystalline aggregate."

Doremus, defendant's witness, says:

"Q. 40. You have, I believe, read the patent in suit. Please state what the product is that is there described and claimed.

"A. I have read the patent in suit, namely, No. 541,138, issued to Thomas L. Willson, and I have compared the statements in the specification with the claim. In the opening paragraph the patentee states that he has invented 'a new and useful product existing in the form of crystalline calcium carbide,' and in lines 9 and 10 states: 'This invention relates to the production of a new form of crystalline calcium carbide.' The claim reads: 'As a new product, crystalline calcium carbide existing as masses of aggregated crystals, substantially as described.' I am therefore of the opinion that the inventor desired to claim one form of crystalline calcium carbide; this new form existing as masses of aggregated crystals. Now it is stated in 'Elements of Crystallography, George Huntington Williams, Ph. D., 1891,' pages 16 and 17, defendant's Exhibit K, that: 'The union of two or more crystal individuals produces a crystal aggregate; while a mass of crystal grains, devoid of their characteristic forms and closely packed together, may be termed crystalline aggregate.' Two figures are given on page 17, Nos. 21 and 22, in illustration of this description. We find a similar state of affairs when we compare a large flake of snow, which consists of well-defined snow crystals, a mass of aggregated crystals, and a hailstone, which is a crystalline aggregate."

Mr. Crocker, defendant's witness, says:

"The development and use of the electric furnace which I have outlined, giving only a few of the prominent contributions to the subject, the literature of which is very extensive, proves that the heating effects of the electric current, whether used according to the arc or incandescent principle, was shown to the world by Davy a century ago, and was practically applied to the actual production of crystalline calcium carbide by Dr. Hare, as early as 1839. * * * The Cowles patent, No. 319,995, defendant's 'Exhibit BC,' specifically mentions oxide of calcium as one of the materials to be mixed with granular carbon and subjected to a high temperature in the Cowles electric furnace, which would result, and actually did result, in the production of crystalline calcium carbide. Nothing further was needed by one skilled in the art to enable him to employ this Cowles furnace and the lime and carbon mixture, in order to obtain crystalline calcium carbide. All that is necessary is to construct the Cowles furnace, use the mixture, and carry on the operations as set forth in the Cowles patents referred to, and the product will be crystalline calcium carbide."

In commenting on the patent in suit, he says that the words "existing as masses of aggregated crystals" were inserted by Willson "in view of and in order to differentiate from the prior art," which Crocker had fully described. He adds:

"This product patent and claim in suit therefor in view of the definite language quoted, does not and was not intended to cover all crystalline calcium carbide, and would not therefore cover all crystalline calcium carbide which is not amorphous."

I have read the evidence of the complainant's witnesses on all these points, but it is unnecessary to quote or discuss same here, as I am forced by the language of the claim, of the specifications, and Willson's letters and statements in his other patents, many of which I have not directly referred to, to agree with the defendant's contention that this is a limited claim, and limited to that form of crystalline calcium carbide which exists as masses of aggregated crystals, and which I find to be a form distinct from crystalline aggregates, which in common parlance may be spoken of as a mass of broken, confused crystals, mixed, it may be, with other material.

### Does Defendant Infringe?

If there was patentable invention or discovery in what Willson did, assuming that he first produced or discovered crystalline calcium carbide existing as masses of aggregated crystals—that is, if it is a new and useful "manufacture or composition of matter"—and the defendant produces, or produces and uses, or sells same, it infringes and is liable as an infringer unless it be true that this product was in public use or on sale for more than two years prior to the filing of the application for the patent in suit. "Any person who has invented or discovered any new and useful * * * manufacture or composition of matter, or any new and useful improvement thereof," etc., is entitled to a patent therefor. There is much evidence tending to show that defendant does not produce, use, or sell crystalline calcium carbide existing as masses of aggregated crystals, but the other form, even if crystalline.

No weight can be given to the evidence of Prof. Moses, complainant's witness, that he finds defendant's product to be "crystalline calcium carbide existing as masses of aggregated crystals," as he constantly claims all through his evidence that the words "existing as masses of aggregated crystals" add nothing to the words "crystalline calcium carbide." In other words, to him all crystalline calcium carbide exists in this form, whether in regular crystal masses or in broken and crushed and confused masses. He recognizes no distinction between a crystal aggregate and a mass of crystal fragments or grains mixed with other material, or a crystalline aggregate. As he persistently refuses to recognize any difference between the one product and the other, he, of course, pronounces the one to be the same as the other. He makes defendant an infringer if it makes or uses any form of crystalline calcium carbide. In giving his reasons for his answer, I cannot discover that Prof. Moses anywhere shows or attempts to show that defendant's product exists as "masses of aggregated crys-

tals" as defined and described by Williams and by several witnesses in the case, or otherwise.

Thomas L. Willson, complainant's witness, says that he made the invention described in the patent in suit, No. 541,138, May 3, 1892, at Spray, Rockingham county, N. C. As his application was filed March 4, 1895, two years and ten months intervened between the making of his alleged invention and the filing of the application. He says that he had an electrical furnace in operation. On September 14, 1892, he wrote in his note book, describing his product "clean and perfect crystals of calcium carbide," and says he sent specimens abroad. Here was his new discovery, his new form of crystalline calcium carbide. In his notes he says he produced crystalline carbide from time to time before. He says that, on producing this calcium carbide of perfect crystals, he sent some of it to Lord Kelvin, Glasgow University, Kingdom of Great Britain. There was no injunction of secrecy, and Lord Kelvin used it. He also sent it to other places and made no secret of his discovery. His evidence is, however, to the effect that it was sent and used for information and to obtain information. It was, however, a public disclosure of his discovery. As to the quantities made at Spray—and he did make quite large quantities there—the evidence tends to show that it was used up by himself and his assistants in experiments in making acetylene gas, etc., not in improving his product; that is, his newly discovered crystalline calcium carbide of the new form or of any form. In fact, it could not be used in experimenting on that product or its production, but was used in experimenting in various compounds that could be made or produced from it, or which he supposed could be produced from it. He was making and using it, with others, to demonstrate, if possible, its success as a commercial commodity. It was not put on public sale, but it was publicly used in a sense.

But was it publicly used in any sense that brings it within the statute? It is a defense to show, and a person cannot have a patent for a new discovery if the new discovery had been in public use or on sale in this country for more than two years before the application for a patent, or had been abandoned to the public. In Elizabeth v. Pavement Co., 97 U. S. 126, 135, 136, 24 L. Ed. 1000, Mr. Justice Bradley, in giving the opinion of the court, said:

"So long as he [the inventor] does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent; but if the inventor allows his machine to be used by other persons generally * * * then it will be in public use * * * within the meaning of the law."

One single case is sufficient to establish prior public use. In Eastman v. Mayor, 134 Fed. 858, 859, 69 C. C. A. 642, 643, the Circuit Court of Appeals in this circuit thoroughly discussed the question of prior public use and sale and laid down certain rules which it is not necessary to repeat; but it is settled that to be an experimental use the experiments must be made in perfecting the invention as described and shown. I take it that, when the invention claimed consists of a new and useful product or composition, time spent in demonstrating its commercial value, while it may be devoted also to determining its

actual qualities, is not time spent in perfecting the invention or discovery. Once made, the discovery is made; and, once discovered, using it, not to perfect or improve it, but to test its efficiency, its value for various purposes, its availability for commercial purposes, must be a public use, if done by others.

In Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755, it was said:

"If an inventor having made his device gives or sells it to another to be used by the donee without limitation, or restriction, or injunction of secrecy, and it is so used, such use is public, within the meaning of the statute, even though the use and the knowledge of the use may be confided to one person."

There the inventor presented his invention, a steel corset, to a lady friend who wore same, and this was held a public use. Here we are not dealing with the process, but with the product, and Willson not only sent it to Lord Kelvin, but he informed him what it was, and Lord Kelvin used it, experimented with it, produced acetylene gas with it, and there was no injunction of secrecy or limitation on its use. It was not a corset to be worn, a machine for manufacturing, a vehicle for conveying persons or goods, but a new form of an old product but little used, and mainly for chemical or laboratory work. It was as much used by Lord Kelvin as it was capable of being used in the then state of the art and progress of science, viz., for generating acetylene gas.

In the case of Egbert v. Lippmann, the court said further:

"We say, thirdly, that some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye," etc.

This discovery was of that nature. True it could have been taken out into some public place and experimented with there, or used there; but that would have been out of the ordinary and unnatural. Suppose that the use by Willson and others was confined to a use in making and perfecting generators, burners, etc., in which or with which to use this new form of crystalline calcium carbide, or its product, was this an experimental use for perfecting the invention, the new discovery? This court thinks not. Universal Adding Machine Co. v. Comptograph Co., 146 Fed. 981, 77 C. C. A. 227; Young v. Clipper Mfg. Co. (C. C.) 121 Fed. 560, affirmed 130 Fed. 150, 64 C. C. A. 502.

When the discovery of the product is complete, is made, then the application for the patent must be made within the two years thereafter, or the inventor runs the risk of losing the benefit of the discovery; if some other person to whom he has disclosed or delivered his invention has used it more than two years prior to the application for a patent. The main use of calcium carbide of any kind was to produce acetylene gas, or gas, and, when Lord Kelvin and others put it to this use, it was a user by them and a public use; there being no restrictions or limitations. But March 16, 1893, Willson filed an application for this discovery, in which he claimed calcium carbide broadly. He did not claim crystalline calcium carbide, or crystalline calcium carbide existing as masses of aggregated crystals. That application was rejected. He filed another claim for the process and product, and finally this claim. Was this sufficient to avoid the statute, or, putting it an-

other way, was this the filing of an application for a patent for his discovery, or invention, sufficient to comply with the statute? In view of Victor Talking Machine Co. et al. v. American Graphophone Co. (2d Cir.) 145 Fed. 350, 76 C. C. A. 180, I must hold, I think, that this was a continuation of the original application sufficient to take the case from the operation of the statute.

Returning then to the original proposition, Does defendant infringe? We must ascertain whether or not defendant's product is crystalline calcium carbide existing as masses of aggregated crystals. If so, infringement is made out if I am to hold the patent valid. I think the patent valid for what it claims, viz., crystalline calcium carbide existing as masses of aggregated crystals. I think this is a new form of calcium carbide produced by the use of lime in the presence of carbon heated, etc., in a so-called "electrical arc furnace," and that it is a form of calcium carbide which discloses such progress in the art as to make the patent valid. I think that by the process used by Willson he discovered a new and better form of crystalline calcium carbide, a new subdivision thereof. The Encyclopedia Americana says:

"Calcium carbide, CaC$_2$ has long been known and was prepared by Woehler, in 1862, by melting an alloy of zinc and calcium in the presence of carbon. Its commercial importance, however, dates from the discovery made by Mr. T. L. Willson, in 1892, that it can be formed by the direct combination of lime and carbon at the temperature of the electric furnace. * * * Its value in the arts depends upon the remarkable fact that when it is thrown into water a double decomposition occurs, by which acetylene gas is formed," etc.

Here no mention is made of the use of the electric arc by Willson. The same work (volume 1, "Acetylene") says:

"It [acetylene gas] was discovered in 1836 by Edmund Davy when experimentally trying water on the impure carbide produced by distilling calcined potassium: named by Berthelot, who, in 1862, prepared it by red-heating ethylene by electrically vaporizing carbon, and by incomplete combustion of coal gas; the same year (1862) Woehler produced the carbide by heating carbon with an alloy of calcium and zinc. Acetylene is also produced by the direct union of carbon and hydrogen when an electric arc is caused to pass between carbon terminals in an atmosphere of hydrogen: but both carbide and gas were laboratory curios till after 1892, when a new method of obtaining cheap carbide was accidentally discovered at the works of Thomas L. Willson, a Canadian at Spray, N. C., and perfected by the chemist Dr. G. De Chalmot and the electrician J. M. Morehead And not long afterward Prof. Henri Moissan, of Paris independently discovered the same in essence; the electric arc acting on mixed lime and carbon. This at once made the gas of great industrial importance for lighting and the carbide as an agricultural germicide."

On the evidence in this case, I think it was the process of Willson by which the production of crystalline calcium carbide, a pre-existing product, was cheapened, that gave it its commercial success. There may be other processes that will do the same thing, and those processes may have been known at the time Willson discovered his, and he may not have been the first to devise the process he claims; but that is not the question here. If the defendant uses the same process in producing its crystalline calcium carbide as that used by Willson, we may expect the same product in the same form if the same materials are also used. If the defendant uses a different process, or a different process and different materials, or even different materials

and the same process, it becomes a question, what is produced? That is, what form of crystalline calcium carbide is produced? It is not sufficient to show that the product of defendant produces acetylene gas, or that defendant's product is produced cheaply, or even by an electric furnace. In this case it is not sufficient for the complainant to show that defendant produces the commercial or chemical equivalent of complainant's crystalline calcium carbide existing as masses of aggregated crystals. The patent is for a particular form, a new form, and that form must be produced by defendant to constitute infringement.

Mr. Whitlock says that defendant's calcium carbide does not exist as masses of aggregated crystals. At page 114 of the defendant's record, he says, in answer to a question:

"Q. 67. Did you find that the calcium carbide made by the Woehler process, so called, and do you find that the defendant's calcium carbide, exists as masses of aggregated crystals, as just defined by you? A. I do not."

He also says, in defining "crystalline calcium carbide existing as masses of aggregated crystals," as follows:

"A. On page 6 of Bulletin 58 of the New York State Museum, under the heading 'Crystal Masses,' I have made the following statement: 'When a number of crystals are formed in a limited space, the individual crystals intersect and lap over one another, producing what is known as crystal masses. If this intersecting is carried to such an extent as to entirely fill the bounded space, leaving no interstices between the crystals, the mineral is said to be massive.' When I wrote the above sentence, I had in mind that the term 'crystal masses,' as used by me, was synonymous with the term "crystal aggregate," as employed by Williams in the work which I have previously cited, and that the term 'massive' is included in the expression 'crystalline aggregate,' as also used by him as above stated."

Charles A. Doremus defines "crystalline calcium carbide existing as masses of aggregated crystals" and "crystalline aggregates," and then says:

"I have repeatedly examined complainant's exhibit of defendant's carbide, taking different specimens from it, and do not find that it is crystalline calcium carbide existing as masses of aggregated crystals within the definition I have given above."

His definition clearly specifies masses of aggregated crystals, and not masses of partially or incompletely formed crystals never developed as such and mixed with other substances in a confused mass. The complainant's witness Fred E. Wright clearly recognizes a distinction between "crystalline calcium carbide" and "crystalline calcium carbide existing as masses of aggregated crystals." In substance, in his answer to cross-question 99, he admits that "masses of aggregated crystals" of calcium carbide are a subdivision of crystalline calcium carbide. His evidence, in brief, amounts to a statement that "crystalline calcium carbide existing as masses of aggregated crystals" is not necessarily the same as "crystalline calcium carbide." That is what defendant claims. The defendant insists that crystalline calcium carbide existed, had been discovered, and was known prior to the discovery of Willson, whatever it was, and that Willson may have discovered this new form, as he says he did, of crystalline calcium carbide existing as

masses of aggregated crystals. I do not see how any one can dispute that all "crystalline calcium carbide existing as masses of aggregated crystals" is "crystalline calcium carbide" in a broad sense; but not all crystalline calcium carbide exists as masses of aggregated crystals. This is a new form, and, of course, an added subdivision of the crystalline calcium carbides. It was the new form, or this "subdivision," as Wright puts it, that Willson discovered and patented. Wright says, in substance (answer to cross-question 101) that crystalline calcium carbide may exist in the following forms, or subdivisions: (1) A single crystal bounded more or less perfectly by crystal faces, a polyhedral; (2) a single crystal without polyhedral faces; (3) polyhedral crystals more or less perfectly developed with respect to bounding crystal faces existing together in aggregated masses; (4) aggregated masses of crystals without polyhedral development. He does not state what he would call a confused mass of incomplete crystals, imperfectly formed, all or some of them, and mixed more or less with other substances; but he says, "I take it that the term masses of aggregated crystals" refers particularly to the third class mentioned, while the term "crystalline" includes all four.

Assume that the claim in suit does describe just the subdivision referred to, viz., polyhedral crystals more or less perfectly developed with respect to bounding crystal faces and existing in aggregated masses, and assume that, since some one discovered these masses existing in this form, they are included in the term "crystalline calcium carbide," as naturally and logically they must be, does this show or prove that this precise form or subdivision was not Willson's discovery, or that this form was known before he made his discovery, or that, because he discovered this new form or subdivision, he also discovered all forms of crystalline calcium carbide? I think not. On the other hand, his evidence confirms the defendant's contention, and the construction I am compelled to put on the claim of the patent in suit. A number of experts on each side have given testimony in this case, and most or all of them have conducted experiments. Willson was not an expert chemist. In his patent in suit he spoke of things he had not seen and of which he knew little or nothing and confesses he took the word of others. I have no doubt he produced a form of crystalline calcium carbide not generally known before. He thought the particular bluish iridescence was of great importance, and perhaps it was as calling his attention to what he had done. That he discovered crystalline calcium carbide is not shown. Such a claim is opposed to the weight of the evidence and authority. Defendant has not shown that Willson did not discover and produce the particular form or subdivision described and claimed in the patent in suit and to which form the claim is, by words having a plain and definite meaning, limited. Such an express limitation by the terms of a claim cannot be disregarded. They are not descriptive generally of crystalline calcium carbide, for the evidence is overwhelming that the crystalline calcium carbide which exists as masses of aggregated crystals is but one form or subdivision of crystalline calcium carbide. Even complainant's witness Joseph P. Iddings, after stating on direct that the addition of the words "existing as masses of aggregated crystals" were tautologi-

cal, was compelled to change his statement on cross-examination, and say (answer to X-Q. 119) :

"In using the term 'tautological' in the direct statement I conveyed by the form of my statement that I used the word 'tautological' to mean a similarity to a certain extent, and not absolute identity of the two expressions, since there is more in one part of the expression than in the other."

It is submitted that, if the words just quoted mean more than "crystalline calcium carbide," they enlarge the claim; if they mean less, they limit the claim. If "there is more in one part of the expression than in the other," the part that has the most in it either enlarges or limits the other.

The language of the courts in Keystone Bridge Co. v. Phoenix Iron Co., 95 U. S. 274, 24 L. Ed. 344, and Westinghouse Air Brake Co. v. New York Air Brake Co., 119 Fed. 874, 56 C. C. A. 404, and Matheson v. Campbell, 78 Fed. 910, 24 C. C. A. 384, and Universal Brush Co. v. Sonn (2d Cir.) 154 Fed. 665, 668, 83 C. C. A. 442, would seem to settle the contention as to the construction of the claim of this patent. In the last case cited this court undertook to save what it regarded as a meritorious patent by giving such a liberal and broad meaning to the claim, which was for a brush frame having a chamber with "a contracted aperture," as to include a brush frame having a flaring chamber and made less extensive by a raised portion within, which lessened the capacity of the chamber and made it the equal of the one described in the claim. The Circuit Court of Appeals held this would not do; that it would revolutionize patent law. The court said:

"We must construe the patent in the light of what it says, not what it might have said. * * * As patents are procured ex parte, the public is not bound by them, but the patentees are; and the latter cannot show that their invention is broader than the terms of their claim, or, if broader, they must be held to have surrendered the surplus to the public."

Apply this language and holding to the claim in suit, which is for "a new form" of calcium carbide, viz., a form thereof in which the "crystalline calcium carbide exists as masses of aggregated crystals." As Willson said that his invention related to "a new form of crystalline calcium carbide," and then claimed a particular form, there being more than two including his, we cannot enlarge his claim.

Perhaps we ought to consider for a moment the meaning of the word "form" as here used. In some cases it might refer to quality alone, but not so here. Complainant's witness Iddings says:

"X-Q. 120. What does the word 'form' mean in connection with crystalline compounds? * * * A. The word 'form,' in connection with crystalline compounds, is used in two different senses commonly. It is commonly employed as a general expression to describe the outward shape of a crystal, and it is also used in a specific or technical sense to express those planes which may be developed on a euhedral crystal, which may be described technically by one mathematical expression."

The Century Dictionary says:

"Form; the external shape or configuration of a body; the figure as defined by lines and surfaces; external appearances, considered independently of color or material. * * * (2) Specifically in crystal, the complex of planes included under the same general symbol. * * * A specific forma-

tion or arrangement; characteristic structure, constitution or appearance; disposition of parts or conditions."

However, here the patentee has described his "new form" claiming greater purity or freedom from other things and specific formation or shape or combination of crystalline formation.

In Matheson v. Campbell, 78 Fed. 910, 24 C. C. A. 384, the Circuit Court of Appeals, per Lacombe, Circuit Judge, held:

"When an alleged infringing compound fails to respond to the various specific tests of identity which the patentee himself has selected and set forth in his patent, he cannot fairly insist that it is identical with his product."

I think this good law and good sense. At least I am bound by it. I might add a score of cases holding the same rule.

As it is not shown that defendant makes, uses, or sells crystalline calcium carbide answering substantially to the claim of the patent in suit, defendant does not infringe. If all crystalline calcium carbide exists as masses of aggregated crystals, then, of course, defendant infringes; but it does not. Crystals are crystals; and masses of crystals, in this science, are not agglomerations of incomplete or broken atoms of crystals, which are confused with mixtures of other materials, even if it contains some perfect or complete crystals.

While Willson used, and complainant uses, the electrical arc furnace, and defendant uses the incandescent electric furnace, it is claimed this bears but little on the real question now under consideration. Willson describes his process, and says:

"It is essential in order to produce the new material here described to," etc.

I find nothing in the claim itself that would read into the product the described instrumentality, material, and mode of making it. The words "substantially as described" do not limit the claim to a product made in the particular mode or by the particular means and instrumentalities described. However, it is clear that the product of defendant's process and instrumentalities is not crystalline calcium carbide "existing as masses of aggregated crystals." It is crystalline, and I am satisfied, from reading the entire record and chemical works, that all calcium carbide is more or less crystalline. Peters, "Modern Chemistry," says:

"Calcium carbide is a dark gray solid more or less crystalline in appearance, always giving off the odor of acetylene owing to its decomposition by the moisture in the air."

I think it inheres in the very nature of the product. However, it is unnecessary to so decide. It is, of course, true that in construing the claim of the patent in suit we are to be guided by the meaning of words as understood when the patent was granted and the then state of the art, and not by the enlarged or narrowed meanings that may have been necessarily or properly given them since as the science progressed. I may remark that neither Whitlock nor Williams make the existence or nonexistence of a free space between the crystals the only essential difference between crystal aggregate and crystalline aggregate. The illustrations show each and speak largely for themselves. Complainant's counsel says that, as defendant's counsel conceded com-

plainant's exhibit, "defendant's carbide Nos. 1 and 2, to be calcium carbide yielding acetylene gas when treated with water, it only remained therefore for complainant to show that this carbide is crystalline within the meaning of the claim."

It was necessary for complainant to show, by admission or otherwise, that defendant's product is calcium carbide, that it is crystalline, and that its crystallinity consists in the fact that it (the carbide) exists as masses of aggregated crystals. To determine whether or not it so exists, we must turn to the dictionaries and scientific works and writings of the time when this discovery was made and ascertain what the words used in the claim then meant, if they meant anything. This is what defendant's experts have done, and this is what this court has endeavored to do. Infringement must be proved by the complainant by a fair preponderance of evidence.

Satisfied that infringement of this narrow claim is not made out, there will be a decree dismissing the bill, with costs.